McCrory Corporation, Respondent, v Benjamin M. Gingold, as Commissioner of Assessment of the City of Syracuse, et al., Appellants. (Appeal No. 1.)

F. W. Woolworth Co., Respondent, v Benjamin M. Gingold, as Commissioner of Assessment of the City of Syracuse, et al., Appellants. (Appeal No. 2.)

Bond Stores New York Corp., Respondent, v Benjamin M. Gingold, as Commissioner of Assessment of the City of Syracuse, et al., Appellants. (Appeal No. 3.)

W. T. Grant Gompany, Respondent, v Benjamin M. Gingold, as Commissioner of Assessment of the City of Syracuse, et al., Appellants. (Appeal No. 4.)

McCrory Corporation, Respondent, v Benjamin M. Gingold, as Commissioner of Assessment of the City of Syracuse, et al., Appellants. (Appeal No. 5.)

(And Three Other Proceedings.)

Fourth Department, April 15, 1976

*Edward P. Kearse, Corporation Counsel (Thomas J. Lowery, Jr., of counsel),* for appellants.

*Smith, Sovik, Terry, Kendrick, McAuliffe & Schwarzer, P. C. (Franklin Schwarzer of counsel),* for respondents.

GOLDMAN, J. Respondents-appellants, Benjamin M. Gingold and Robert Z. Srogi, Commissioners of Assessment of the City of Syracuse during the years of 1964 through 1970, appeal from four judgments which reduced the tax assessments of

petitioners-appellees, McCrory Corporation, F. W. Woolworth Co., Bond Stores New York Corp. and W. T. Grant Company for the years of 1964 through 1970. Prior to the argument of these appeals the city and W.T. Grant entered into a settlement agreement and the judgment in that matter is not involved in these appeals. Appellant city also appeals from an order and judgment of the Supreme Court of Onondaga County which awarded petitioners $13,692.60 for attorneys' fees and disbursements and $20,649.28 as reimbursement for expenses, pursuant to section 716 of the Real Property Tax Law.

In addition to the instant cases, several other proceedings have been instituted challenging assessments on property in the downtown business core of the City of Syracuse. These appeals are the second of these proceedings which have been argued before us dealing with assessment on parcels of property in the City of Syracuse for the years 1964 through 1970. The first appeal reached our court in 1973 *(Guth Realty v Gingold,* 41 AD2d 479, affd 34 NY2d 440). Mr. Justice SIMONS, writing for a unanimous court, modified the findings and judgment of Special Term. The same Special Term Justice who rendered the judgment in *Guth* presided at the hearings on the petitions in the instant appeals. The legal issues are the same in both appeals and were disposed of in *Guth.*

There are two parts to the cases at bar: the first is to establish the proper equalization rates for this tax roll for the years in question; the second is to determine the full market value of petitioners' properties against which the equalization rates will apply.

All of the evidence received in the *Guth* case relating to the equalization ratios for the City of Syracuse during the years in question was incorporated in this record by stipulation of the parties. In addition, as at the *Guth* proceedings, appraisal testimony as to fair market value and taxes assessed against 10 selected city parcels (five parcels selected by each side) was received in order to establish the proper assessment ratios to be applied to petitioners' properties for the years 1964 through 1970. In both *Guth* and the instant cases Special Term relied solely on the ratios established by the State Board of Equalization for all the years involved and did not evaluate the testimony concerning the 10 selected parcels. Thus, Special Term found the same assessment ratios in *Guth* and in the instant cases. As we held in *Guth,* placing sole reliance on

the State equalization rate for the years 1964 through 1969 was improper (Real Property Tax Law, § 720, subd 3, prior to amendment by L 1969, ch 302, § 1, eff April 27, 1969; *Guth Realty v Gingold, supra).* We must, therefore, revise the rates adopted by Special Term for the years 1964 through 1969. As to 1970, a finding based wholly on the State equalization rate was proper *(Guth Realty v Gingold,* 41 AD2d, at p 482, affd 34 NY2d, at p 450).

Petitioners-respondents urge that all the assessment ratios found by our court in the *Guth* case should be applied in the instant cases; that the City Tax Commission who was a party in *Guth* should be collaterally estopped from relitigating the same issues as to ratios raised and settled in *Guth.* We agree with petitioners that the equalization ratios determined with specificity and clarity in Mr. Justice SIMONS' opinion in *Guth* should and do control in the determination of the equalization ratios in the cases at bar.

The proceedings that we are reviewing are for the same tax years in the same business area as in the *Guth* case. The *Guth* property in the 300 block of South Salina Street is on the same tax roll as the assessments in the instant cases. The defendants are the same, the years in question are identical and all other factual and legal issues as to assessment ratios are the same. The defendants had full and fair opportunity to be heard in the *Guth* proceedings and the issues as to the assessment ratios having been determined should be applied in the instant proceedings. Collateral estoppel is indeed the appropriate method of disposing of the equalization issue.

It is now a recognized principle that where a party (in the instant case, the city) has had a full opportunity to litigate a particular issue it cannot reasonably demand and be given a second opportunity. The test of whether the city should be estopped is succinctly expressed in *Schwartz v Public Administrator of County of Bronx* (24 NY2d 65, 71): "New York Law has now reached the point where there are but two necessary requirements for the invocation of the doctrine of collateral estoppel. There must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action, and, second, there must have been a full and fair opportunity to contest the decision now said to be controlling." (See, also, *B. R. DeWitt, Inc. v Hall,* 19 NY2d 141; *Israel v Wood Dolson Co.,* 1 NY2d 116; cf. *Anderson v Snyder Tank Corp.,* 44 AD2d 761.)

The fact that subdivision 3 of section 720 of the Real Property Tax Law, prior to the 1969 amendment, provided that the parties should use selected parcels in approving assessment ratios should not preclude the general defenses, such as collateral estoppel of *res judicata,* from being raised. Interestingly, petitioners offered to use the same select parcels as were used in *Guth.* Although the city refused this offer, two of the select parcels in *Guth* were used in the instant proceedings. Our examination of the *Guth* record convinces us that the *Schwartz v Public Administrator (supra)* requirement that "there must have been a full and fair opportunity" afforded to contest the decision was fulfilled in a most comprehensive manner in *Guth.* As stated by petitioners, there were in excess of 2,640 pages of testimony and some 165 exhibits. Well-qualified experts, including the Chief Appraiser of the New York State Board of Equalization and Assessment and distinguished, experienced university professors, gave constructive testimony in *Guth* which enabled our court to make the findings we reached on the issue of the ratios for the years in question. The same appraisal experts testified in *Guth* as in these proceedings.

It is now well recognized that "[t]he principle of judicial or collateral estoppel embodies a policy which the courts have deemed necessary for the maintenance of a 'prompt and nonrepetitious judicial system'" *(Huston v De Leonardis,* 44 AD2d 110, 113). We hold that the application of this doctrine is determinative of the issue of assessment ratios. We note that, even were we not to apply the doctrine of collateral estoppel, our results relating to assessment ratios would still conform substantially to those reached in *Guth.*

As stated above, until the 1969 amendment to subdivision 3 of section 720 of the Real Property Tax Law, use of the State equalization rate as the sole basis of proving inequality of assessments was improper. But, while the State equalization rate established for the roll containing the assessments under review herein was insufficient standing alone to sustain a finding of inequality for the years 1964 through 1969, it was competent evidence to be considered along with the evidence of selected parcels (former subdivision 3 of section 720 of the Real Property Tax Law [L 1961, ch 942]; *Matter of O'Brien v Assessor of Town of Mamaroneck,* 20 NY2d 587, 595-596). Indeed, there is substantial evidence in the record to support a finding that the random or "probability" sampling techniques

employed by the State Board of Equalization and Assessment are superior to a parcel selection method wherein either side will, naturally, tend to choose parcels that represent extremes of the assessment ratio scale in order to support its position. (See, also, Inequality in Real Property Tax Review, 19 Buffalo L Rev 565, 571.)

We have analyzed the evidence as to the 10 selected parcels and have made findings as to the ratios produced by that method. Considering these ratios, and giving weight to those rates established by the State board as well, we find that our results would vary by one or two percentage points at most from those found in *Guth.* Having adopted the tax assessment ratios applied in *Guth,* we now turn to consider the findings as to the full market value of the taxpayers' parcels.

Special Term in its findings as to the full market value adopted *in toto* the appraisal testimony of petitioners-respondents in valuing the three subject parcels. While we concede the knowledgeability of petitioners' appraisers and recognize their greater familiarity with the Syracuse area, we find that the city's appraisers' knowledge of appraisal techniques merits consideration and we are persuaded that their testimony, therefore, should not have been wholly discounted.

In reviewing proceedings of this nature, the Appellate Division is empowered to make new findings of value where *"it appears that the court at Special Term has failed to give to conflicting evidence the relative weight which it should have" (People ex rel. MacCracken v Miller,* 291 NY 55, 61, citing *Matter of City of New York [Newtown Creek],* 284 NY 493, 497; Real Property Tax Law, § 724). This we now do.

### McCRORY PROPERTY

As did the trial court, we adopt petitioner's appraiser's values as to land, based on his choice and analysis of comparables and his long-standing familiarity with the Syracuse market. However, we find that the city's appraiser's income method of valuation, employing the annuity method of capitalization, is to be preferred to the income approaches used by petitioner, for the following reasons: (1) The city's method made allowance for the fact that the upper floors in the building had no retail rental value, but could be evaluated as storage. On the other hand, the petitioner's appraiser gave no value to the upper floors even though its own witness, a real estate broker, testified that the space had some nominal value

as to storage; (2) Although he did not employ this method, petitioner's appraiser conceded that the annuity method of capitalization is appropriate to the single-tenant, long-term lease properties involved; (3) The comparability of the leases evaluated by the city to reach its economic rental for the subject was substantiated, while petitioner's appraiser offered insufficient information to demonstrate the appropriateness of the leases which he evaluated to derive economic rent. While utilizing the general methodology of the city's appraiser we would reduce his findings of economic rental in light of the credible testimony of other witnesses indicating lower values, and give effect to the testimony that, in fact, floors two through four were unrentable in this period. It appears unnecessary to make a separate valuation for each year in question, since the city's yearly figures change primarily to reflect inflationary trends which are of questionable relevance, and other figures can be stabilized for the period evaluated. We therefore find the value of the subject property for the years 1964, 1965, 1966 and 1967 to be $965,000 ($435,000 allocated to land), and for the years 1968, 1969 and 1970, $965,000 ($520,000 allocated to land). High interest rates in these latter years tend to deflate value based on the income approach, but our findings are supported in the record by the city's market data evidence as well.

## WOOLWORTH PROPERTY

As to this parcel, the parties are in fairly close agreement as to full value. We would again adopt the taxpayer's testimony as to land value.

Both appraisers relied most heavily on the market data approach to value for the years 1964 through 1967. We find that while the final opposing results were rather close, we would increment petitioner's appraiser's findings because insufficient adjustments to comparable sales were made and we would temper the city's findings because of excessive adjustments to its comparables. We find the value of the property to be $1,280,000 ($880,000 allocated to land) for the years 1964, 1965, 1966 and 1967.

For the years 1968, 1969 and 1970 we believe that Special Term's findings, which are supported by both the petitioner's market value testimony and the city's income value testimony, as averaged over these years, should be affirmed. Thus, for 1968 through 1970 we find the value of the property to be

$1,410,000 ($890,000 of which is allocated to land). These findings do not alter the final results reached by Special Term as to overassessment, since Woolworth limited its prayer for relief to reduction of the assessments by $318,000 for all years in question.

## BOND PROPERTY

For the reasons set forth above in the McCrory discussion, we adopt petitioner's testimony as to land value. However, we find that the rentals evaluated in petitioner's appraiser's income approach were not shown to be sufficiently comparable to the subject property to support his finding of economic rent. On the other hand, the city's estimate of economic rent should be reduced, since, for 1964, it exceeds all comparables studied and, furthermore, it is consistently incremented for each succeeding year, although the weight of the evidence supports a finding of decreasing rather than increasing rentals in the Syracuse retail core during this period. Conflicting testimony in market data approaches of both appraisers also indicates the need for tempering their results. Although both appraisers used the same whole-to-whole comparable in one instance, petitioner gave it a 5% net adjustment to the subject, while the city adjusted it well over 50%. In both cases the adjustments are inconsistent to some degree with other testimony supplied at trial. As we did in *Guth,* we agree with petitioner's appraiser that it was neither accurate nor necessary to increase the values of the properties by annual increments to reflect a general national 4% inflationary trend. We therefore find the value of the property for the years 1964, 1965, 1966 and 1967 to be $440,000 ($200,000 allocated to land), and, to reflect cumulative economic and neighborhood trends, increase the value to $503,000 ($245,000 allocated to land) for 1968, 1969, and 1970. (See *Guth Realty v Gingold, supra,* p 483.)

## CONCLUSION

Applying the ratios to the full value, the assessed value of the McCrory property should be: for 1964, 1965 and 1967—45% × $965,000, or $434,250, $195,750 of which is allocated to land; for 1966—50% × $965,000, or $482,500, $217,500 of which is allocated to land; for 1968 and 1969—45% × $965,000, or $434,250, $234,000 of which is allocated to land; for 1970—43% × $965,000, or $415,000 (rounded), $223,600 of which is allocated to land. Since the property was assessed at

$588,800 for each year in question, the overassessments are as follows: 1964—$154,550; 1965—$154,550; 1966—$105,600; 1967 —$154,550; 1968—$154,550; 1969—$154,550; 1970—$173,800. As modified this judgment should be affirmed.

We find the assessed value of the Woolworth property to be: for 1964, 1965 and 1967—45% × $1,280,000, or $576,000, $396,000 of which is allocated to land; for 1966—50% × $1,280,000, or $640,000, $440,000 of which is allocated to land; for 1968 and 1969—45% × $1,410,000, or $634,500, $400,500 of which is allocated to land; for 1970—43% × $1,410,000, or $606,300, $382,700 of which is allocated to land. Since the property was assessed at $1,033,000 for each year in question, the overassessments, as limited by the pleadings, are $318,000 for each year. The judgment of Special Term as to petitioner Woolworth for the years 1964 through 1970 should be affirmed.

The assessed value of the Bond property should be: for 1964, 1965 and 1967—45% × $440,000, or $198,000, $90,000 of which is allocated to land; for 1966—50% × $440,000, or $220,000, $100,000 of which is allocated to land; for 1968 and 1969—45% × $503,000 or $226,350, $110,250 of which is allocated to land; for 1970—43% × $503,000, or $216,300, $105,350 of which is allocated to land. Since the property was assessed at $303,300 for each year in question, the overassessments, as limited by the pleadings, are as follows: 1964— $103,300; 1965—$103,300; 1966—$83,300; 1967—$103,300; 1968—$77,000; 1969—$77,000; 1970—$87,000. We therefore modify the judgment of Special Term as to petitioner Bond for the years 1966, 1968, 1969 and 1970, and, since the pleadings limited the relief sought to the amount of $103,300, affirm for the years 1964, 1965 and 1967.

The judgment awarding fees and disbursements to petitioners' attorneys and awarding petitioners expenses paid by them for appraisals and statistical studies and analyses, pursuant to section 716 of the Real Property Tax Law, is reasonable and proper and should be affirmed.

MOULE, J. P., MAHONEY, DILLON and WITMER, JJ., concur.

Judgment, in Appeal No. 1, unanimously modified in accordance with opinion by GOLDMAN, J., and as modified affirmed, without costs.

Judgment, in Appeal No. 2, unanimously affirmed, without costs.

Judgment, in Appeal No. 3, unanimously modified in accordance with opinion by GOLDMAN, J., and as modified, affirmed, without costs.

Appeal, in Appeal No. 4, unanimously dismissed, without costs.

Judgment, in Appeal No. 5, unanimously affirmed, without costs.