W. T. GRANT COMPANY, Respondent-Appellant, v ROBERT Z. SROGI, as Commissioner of Assessment of the City of Syracuse, Appellant-Respondent. (Appeal No. 1.)

ED GUTH REALTY, INC., Respondent-Appellant, v ROBERT Z. SROGI, as Commissioner of Assessment of the City of Syracuse, Appellant-Respondent.

FRANCHISE REALTY INTERSTATE CORPORATION, Respondent-Appellant, v ROBERT Z. SROGI, as Commissioner of Assessment of the City of Syracuse, Appellant-Respondent. (Appeal No. 2.)

W. T. GRANT COMPANY, Respondent, v ROBERT Z. SROGI, as Commissioner of Assessment of the City of Syracuse, Appellant. (Appeal No. 3.)

Fourth Department, December 14, 1979

## APPEARANCES OF COUNSEL

*David M. Garber, Corporation Counsel (Donald A. Marshall,* special counsel), for appellant-respondent in appeals Nos. 1 and 2; *(James Gelormini* of counsel), in appeal No. 3

*Smith, Sovik, Kendrick, McAuliffe & Schwarzer, P. C. (Franklin J. Schwarzer* of counsel), for respondents-appellants in appeals Nos. 1 and 2 and respondent in appeal No. 3.

## OPINION OF THE COURT

SIMONS, J.

These proceedings commenced pursuant to article 7 of the Real Property Tax Law seek review of the assessments of two downtown Syracuse commercial properties for the years 1971-1976. The parties cross-appeal from the trial court's determination of the fair market values of the properties; the city appeals from the orders which award additional allowances to the taxpayers pursuant to both CPLR 8303 (subd [a], par 2) and pursuant to section 722 of the Real Property Tax Law; and the city appeals from an order of Special Term which enjoined the city and its agents from transferring title to premises of petitioner 423 South Salina Street, Inc. (formerly W. T. Grant Company) acquired for delinquent 1976 taxes and from transferring any title acquired by the city for subsequent delinquent taxes until final determination of the taxpayer's pending review proceedings.

The judgments fixing the assessed valuation should be modified by fixing lower values of the tax properties and the orders and judgments should be modified by striking those portions which award additional allowances pursuant to CPLR 8303. The order granting a preliminary injunction should be affirmed.

The first of the two properties[1] is located at 323 South Salina Street in Syracuse, New York, formerly owned by Ed Guth Realty, Inc., but sold in 1974 to Franchise Realty Interstate Corp., the real estate division of McDonald's Restaurants. The second parcel is located at 425-427 South Salina Street and was formerly owned by the University of Rochester and rented by net lease to W. T. Grant Company until that corporation became bankrupt. In late 1976 the property was acquired by 423 South Salina Street, Inc. For convenience, we refer to the two properties as the Guth and Grant properties.

I

The Guth assessments have been considered twice before by this court and additional facts may be found in decisions in those appeals (see *Matter of Guth Realty v Gingold,* 16 AD2d 372; *Guth Realty v Gingold,* 41 AD2d 479, affd 34 NY2d 440). Briefly, the property is located in the 300 block of South Salina Street. It is improved with a five-story brick building which was originally constructed in 1890 and was remodeled in 1954. The lot is rectangular having 25.12 feet frontage on South Salina Street and a depth of 132 feet. Ed Guth Realty, Inc., was the owner of the real estate before the sale and the building was occupied by a separate corporation, Ed Guth Hobbies, Inc., which operated a hobby shop. Both corporations are owned by Ed Guth. The property has been vacant since it was sold to Franchise Realty in 1974.

The property had been listed for sale continuously since 1962. Franchise Realty originally offered to buy it for $130,000, but the price was later negotiated upward to $150,-000. After the sale, the licensee that McDonald's had selected to run the business declined to do so. The property is now for sale but the owner has not received any offers to buy. It received one offer to rent the building for $18,000 per year, but the offer was declined because it did not include the annual real estate taxes.

The city has assessed the property at $212,200 each year from 1964-1974, the assessment indicating a full value (by applying the 1974 equalization rate) of $493,000. In 1975 and 1976 the city assessed the property at $180,200, indicating a

---

1. Although these appeals involve only two properties, they were tried jointly with proceedings involving three others and the evidence, by stipulation, applied to all five properties.

full value of $450,500. At the trial of these proceedings the city's appraiser testified that for the years 1971-1976 the full value of the property was a low of $460,100 in 1970 and a high of $487,800 in 1976. The taxpayers' appraiser found that values had declined between 1971-1976 and he valued the property for the years in suit at prices ranging from $180,000 to $140,000. The trial court made the following findings and ordered the assessments reduced accordingly:

| Full Value | Equalization Rate | Assessment |
|---|---|---|
| 1971-1972 - $300,000 | 45% | $135,000 |
| 1973-1974 - $275,000 | 43% | $118,000 |
| 1975-1976 - $250,000 | 40% | $100,000 |

The Grant property consists of an irregular parcel of land containing 24,500 square feet, extending the width of the block from South Salina Street to South Warren Street. The lot has 60 feet frontage on South Salina Street and 105 feet frontage on South Warren Street. The property was owned originally by the University of Rochester and was leased to Grant in 1944 for an annual ground rent of $17,322.33, the tenant to pay all taxes, utilities, insurance, and building maintenance. Grant then constructed a store having a basement and five stories which covered the entire parcel, sold it to the owner of the land at cost and then leased it back. The basic "rental" paid by the tenant covered the ground lease and the cost of amortizing the building. The amount fluctuated annually but reached a maximum of $182,674.29 per year in 1952. The Grant lease was extended to 1982 with options to the year 2043 available. The tenancy ended in early 1976 when the chain became bankrupt and vacated the premises.

In 1974 Grant decided to close its store because of declining sales volume but it was persuaded to remain open when the owner agreed to defer $40,000 of the annual rent (the annual rent at the time was $80,425.80) and when the city agreed to settle the 1964-1970 tax litigation then on appeal for a reduced amount, payment to be spread over three years and conditioned upon the store remaining open in 1975, 1976 and 1977.

Nevertheless, Grant closed in 1976 and the premises were sold by the University of Rochester to 423 South Salina Street, Inc., in late 1976 for the sum of $25,000. Since the 1976 taxes, penalties and interest were unpaid, the total consideration for the transfer was $175,774.32.

Each year during the period 1964-1976, the city has assessed the Grant property at $1,135,700. The equalization rate has fluctuated, but the indicated full value of the real property during that period based on that assessment was a low of $2,523,540 and a high of $2,838,250. At trial the city's appraiser testified that the property had a full value of $3,028,-200 to $3,150,700. The taxpayers' appraiser testified that the full value was $1,200,000 in 1971 and declined annually to a low of $625,000 in 1976. The trial court made the following findings and ordered the assessments reduced accordingly:

| Full Value | Equalization Rate | Assessment |
|---|---|---|
| 1971-1972 - $1,830,000 | 45% | $823,500 |
| 1973-1974 - $1,670,000 | 43% | $718,100 |
| 1975-1976 - $1,510,000 | 40% | $604,000 |

The parties cross-appeal from these determinations of full value.

We may dispose of the city's appeals on valuation quickly. Its request for new trials is premised upon general contentions that the trial court's decision is inconsistent, arbitrary and not supported by the evidence. We do not find it so. Nor do we find reversal is required because the trial court failed to state with greater specificity the evidence and computations it relied upon to support its decision (see *Matter of City of Rochester v BSF Realty,* 59 AD2d 1035; *Miller Paper Co. v State of New York,* 34 AD2d 880). The court's findings and conclusions are sufficient to provide us with the means of intelligent review and insofar as further findings may be required after this lengthy nonjury trial, we are able to supply them, as we have done in the past (see *Guth Realty v Gingold,* 41 AD2d 479, *supra; Matter of Rice v Srogi,* 70 AD2d 764; *McCrory Corp. v Gingold,* 52 AD2d 23).

█ Furthermore, we find no error in the trial court's refusal to accept the evidence of value offered by the city's appraiser in the *Guth* case. He valued the land by the market data approach and the improvements by capitalizing income, but his comparables were open to serious criticism and required substantial adjustments. Moreover, he applied his adjusted income figures to the entire five floors of the building, although the upper floors were functionally obsolete and had only limited utility. In selecting land comparables he rejected market data of several recent sales in the immediate area of the tax parcel and used some transfers that involved condem-

nation proceedings. He erroneously refused to consider the 1974 sale of the subject parcel for any purpose (see *Matter of Rusciano & Son Corp. v Roche,* 70 AD2d 953) and his full value for the property was more than three times the 1974 sale price.

The taxpayers contend that the court's determination of value was too high.

The statute requires that real property be assessed at full value (Real Property Tax Law, § 306) which is the same as fair market value *(Matter of Hellerstein v Assessor of Town of Islip,* 37 NY2d 1, mod 39 NY2d 920; *Matter of Onondaga County Water Dist. v Board of Assessors of Town of Minetto,* 45 AD2d 258, 261). Petitioner Guth reminds us that the classic definition of market value is the amount that one desiring but not compelled to purchase will pay for property under ordinary conditions to a seller desiring but not compelled to sell (see *People ex rel. Parklin Operating Corp. v Miller,* 287 NY 126, 129). Noting that the trial court found that the sale from Guth to Franchise Realty Interstate Corp. was an arm's length transaction, petitioner contends that the price of $150,-000 should be given controlling weight under the rule "that the purchase price set in the course of an arm's length transaction of recent vintage, if not explained away as abnormal in any fashion, is evidence of the 'highest rank' to determine the true value of the property at that time" *(Plaza Hotel Assoc. v Wellington Assoc.,* 37 NY2d 273, 277; see, also, *Matter of Rice v Srogi,* 70 AD2d 764, *supra; Matter of Lane Bryant, Inc. v Tax Comm. of City of N. Y.,* 21 AD2d 669; Ann. 89 ALR3d 1126).

The trial court declined to adopt the sale price in this case because it found that Guth was willing to sell at a loss "to discontinue business at that location due to the fact that he considered the expense of operation did not justify continuing the business there."[2] In other words, Guth thought that the

---

2. The court's decision also may have been influenced by an understandable deference to our prior *Guth* decisions setting a higher value. In 1961 the property was assessed for $258,800. The trial court reduced the assessment to $180,000 and the Appellate Division modified the assessment to $240,000 *(Matter of Guth Realty v Gingold,* 16 AD2d 372, *supra).* In 1973 *(Guth Realty v Gingold,* 41 AD2d 479, *supra),* the trial court found a value of $186,000 (assessed value $83,700). On appeal the value was modified to $350,000 for the years 1964-1967 (an assessed value of approximately $175,000 for that period) and $375,000 for 1968-1970 (assessed value of $163,000-$156,000). It now seems clear, however, that downtown Syracuse values have decreased with the passage of time rather than increased (see *McCrory Corp. v Gingold,* 52 AD2d 23, 29, *supra).* The trial court found that to be the fact.

taxes were too high and the profits were too low. That is not an uncommon complaint or an abnormal impetus for selling, and it supports rather than impugns the probative value of this sale, particularly in view of the surrounding circumstances. The property had been offered for sale continuously for 12 years and Franchise Realty Interstate Corp. had made the only offer worth considering; that originally for $130,000, but finally for $150,000. Guth was in sound financial condition and under no financial compulsion to sell; the sale was not influenced by options, extended payments or other extraneous financial matters; and it was contemporaneous with the tax period under review. Moreover, since the purchase Franchise Realty has attempted to sell or lease the property without success.

The court also seemed concerned that the price was not indicative of real value because the real estate market on South Salina Street was depressed. The decrease in the values of downtown Syracuse properties was not related to general and pervasive economic conditions, however, but to a long-term change in shopping habits and a decrease in the urban population. These factors are distinguishable from the temporary economic conditions which prevailed during the depression. Assessors may have been justified in giving less weight to the unusually low sales of that time (cf. *People ex rel. Buck v Rapp,* 36 NYS2d 790, 796, affd 266 App Div 709), but where market conditions have persisted for a number of years in a particular area without abatement, as they have on South Salina Street, a sale reflecting those conditions and not otherwise subject to criticism is entitled to full weight in determining value. A period of depressed prices, no longer temporary, "does not indicate merely fluctuating values, but rather a change in economic level" *(People ex rel. Four Park Ave. Corp. v Lilly,* 267 App Div 102, 103-104; cf. *People ex rel. Owens v Schmiedel,* 264 App Div 742, affd 290 NY 900).

On the evidence of the sale price alone, petitioner Guth made a strong prima facie case for reduction (see *Mobil Oil Corp. v Tax Comm. of City of N. Y.,* 60 AD2d 910), and its case was further supported by credible appraisal evidence. Based on that evidence, the assessment of the Guth property for the years 1971-1976 should be reduced as follows:

| Full Value | Equalization Rate | Assessment |
|---|---|---|
| 1971-1972 - $180,000 | 45% | $81,000 |

| | | |
|---|---|---|
| 1973-1974 - $150,000 | 43% | $64,500 |
| 1975-1976 - $150,000 | 40% | $60,000 |

The value is apportioned by assigning $100,000 as the value of the land for each year.

 Both appraisers valued the Grant property by capitalizing income. The taxpayers' appraiser testified that reasonable rental income could be determined by multiplying gross sales by a factor of 2.5% to 4% (he used 3%), representing the rent which a national chain store would agree to pay on a percentage lease, and capitalizing the result at 9.25% to 12.2%, the rate of return expected on this type of investment during the years in question. Using this method, he found market values for the year 1970-1976 of $1,200,000 to $700,000. The city's appraiser used estimated net rental income (determined by comparable leases) and capitalized this income at 9% to find that the value of the improvements for 1971-1976 was $1,135,-500 to $1,190,500. He added land value to these amounts to find full values of $3,028,200 to $3,150,700. The court found full values for 1970-1976 between a high of $1,830,000 and a low of $1,510,000, but it did not state the method of appraisal that it accepted or the computations used in determining value.

We prefer to compute value on a percentage of gross sales because that is the method normally used by national tenants and also because of the difficulty that the city appraiser had in finding credible comparables to support his square-foot rental formula.

We accept generally the figures of the taxpayers' appraiser. We have modified them because the Grant business was suffering financial distress and by 1974 its sales had declined to the point where it contemplated closing the store. The sales of some stores in the area, however, were improving at that time. Therefore, we have adjusted the appraiser's figures somewhat by using his 1971 figures for that year and 1972 and, because we do not accept gross sales for 1974-1976 as reliable, we have used the appraiser's 1973 figures for the remaining years. The assessments for the Grant property for the years 1971-1976 should be reduced as follows:

| Full Value | Equalization Rate | Assessment |
|---|---|---|
| 1971-1972 - $1,200,000 | 45% | $540,000 |
| 1973-1974 - $ 950,000 | 43% | $408,500 |
| 1975-1976 - $ 950,000 | 40% | $380,000 |

The value is apportioned by assigning $370,000 as the value of the land for each year.

## II

■ ■ The city contends that the court erred in granting petitioners additional allowances. In each case the court awarded costs and disbursements plus additional allowances which included $500 for each proceeding as an additional allowance pursuant to CPLR 8303 (subd [a], par 2) and $500 for each proceeding as an additional allowance pursuant to subdivision 2 of section 722 of the Real Property Tax Law. Inasmuch as the assessments were reduced, the taxpayers were entitled to costs (Real Property Tax Law, § 722, subd 1), and they could also request an additional allowance pursuant to subdivision 2 of section 722 of the Real Property Tax Law. They could not receive in addition to those sums, however, the additional allowance permitted by the CPLR.

The CPLR gives the court discretionary power to award an additional allowance pursuant to CPLR 8303 (subd [a], par 2): "to any party to a difficult or extraordinary case, where a defense has been interposed, a sum not exceeding five per cent of the sum recovered or claimed, or of the value of the subject matter involved, and not exceeding the sum of three thousand dollars." The purpose of this section is to indemnify a successful party for expenses beyond those usually incurred (see *Metropolitan Sav. Bank v Tuttle,* 183 Misc 879, 880; *Town of Brighton v Rochester Vulcanite Pavement Co.,* 149 Misc 592, revd on other grounds 244 App Div 546).

Somewhat similarly, subdivision 2 of section 722 of the Real Property Tax Law provides for an additional allowance to a successful taxpayer in an assessment review proceeding if the court finds as a fact that (a) the assessment of the property was increased without adequate cause after a final order or stipulation between the parties determined the assessment for a previous year, or (b) the amount of the assessment was grossly discriminatory. This additional allowance may not exceed $500 for each year under the review or a maximum of $2,500.

■ The language of the two sections differs in several respects. The CPLR permits a maximum of $3,000 in difficult or extraordinary cases; the maximum in assessment review proceedings is $2,500. The CPLR provision is discretionary;

the Real Property Tax Law allowance is mandatory but cannot be granted unless certain findings of fact are made. But most importantly, the purpose of the Real Property Tax Law provision is not to reimburse parties forced to litigate complex cases, but rather to penalize political subdivisions which abuse their taxing power. The section was enacted "to discourage the practice in some tax districts of continuing to place high assessments on the same properties year after year even though a court has determined that lower assessments are proper" (NY Legis Ann, 1950, p 327).

■ Although nothing in the wording of the present statutes suggests that the two provisions are mutually exclusive, we have held that an additional allowance pursuant to CPLR 8303 (subd [a], par 2) may not be granted in an assessment review proceeding (Matter of Rice v Srogi, 70 AD2d 764, supra; Matter of Jacobs v Town Bd. of Assessors, — AD2d —; see 24 Carmody-Wait 2d, NY Prac, §§ 146:117, 146:120). Our rule is based upon legislative history. Provisions substantially similar to the present ones were found in the Civil Practice Act and the Tax Law. In 1934 the Civil Practice Act was amended to exclude additional allowances in tax assessment cases however, because of the burden on tax districts stemming from sudden decreases in valuation resulting from the depression (L 1934, ch 361). At that time the Tax Law contained a provision for costs, but none for additional allowances (L 1949, ch 551). In 1950 the Legislature again amended the Civil Practice Act and the Tax Law by chapter 654 of the Laws of 1950. The amendment to the Civil Practice Act provided that in tax assessment cases, additional allowances could be had only as provided in the Tax Law. Chapter 654 of the Laws of 1950 also amended the corresponding Tax Law section to permit costs and allowances in review proceedings and the legislative intent to limit the taxpayer's recovery of additional allowances is clear from this joinder of the two complementary provisions and the integrated language of the two in the same bill. The Civil Practice Act and the Tax Law have been superseded by the CPLR and the Real Property Tax Law, of course, and an ambiguity now exists because reference to the Tax Law was not carried over into the CPLR when it replaced the Civil Practice Act in 1962. We do not find any legislative history which explains the omission, but in the absence of evidence that the Legislature intended to change prior law, we construe the statutes as they operated prior to

recodification and limit petitioners to the costs and allowances permitted by the Real Property Tax Law.

The city further contends that even though an additional allowance was permissible under the Real Property Tax Law, the court abused its discretion in granting the taxpayers' application.

■ An additional allowance is permissible only where the court finds as a fact that the assessment was increased without adequate cause or was grossly discriminatory. Both of these properties had been the subject of prior litigation resulting in reduced assessments and in both cases the city reinstated the prejudgment assessments the next year and continued them each year thereafter. The city contends that in doing so it acted with adequate cause, that each annual tax roll states a new assessment, and the assessors are not bound to accept a court's prior determination of value when assessing property in subsequent years. Citing *Matter of Beekman Family Assn. v Boyland* (281 App Div 525) to support its position, the city maintains that it acted reasonably in reinstating the original assessments after they had been reduced by judgment and, therefore, the taxpayers are not entitled to an additional allowance. In *Beekman,* however, the evidence indicated that property values had increased the year the assessment was reinstated, thus justifying the city's action. There is no evidence in this record that South Salina Street property increased in value between 1971-1976. Quite the contrary is true. The trial court specifically found that downtown Syracuse property values declined during the tax years in question and there is no evidence to justify the city's actions in reinstating the discredited assessments. The city thus acted without adequate cause in restoring the prejudgment assessments but alternatively, the court would also have been justified in granting the allowance because the record demonstrates that petitioners' assessments were grossly discriminatory.

The judgments and orders should be amended to strike the award of additional allowances pursuant to CPLR 8303 (subd [a], par 2) and to reduce the additional allowances granted pursuant to subdivision 2 of section 722 of the Real Property Tax Law to the maximum award of $2,500 for the Grant property and a maximum of $2,500 for the Guth-Franchise real property, the costs to remain as taxed.

## III

The taxes on the Grant property for the tax years 1976-1979 have not been paid, and on April 9, 1979, acting pursuant to the provisions of its tax act, the city acquired title to the property for the 1976 taxes for the purpose of selling it. The new owner, 423 South Salina Street, Inc., successor to the University of Rochester, obtained an order to show cause with a temporary restraining order which applied not only to the 1976 proceeding now before us on this appeal but also to the 1977-1979 tax review proceedings pending in Supreme Court. On the return date Special Term enjoined the city and its agents "during the pendency of the above captioned proceedings and until their final determination from transferring the title acquired * * * for non-payment of 1976 taxes or non-payment of any of the subsequent taxes, which are the subject matters of a proceeding for reduction, until the final determination of said proceedings for the taxable [sic] years 1976, 1977, 1978 and 1979 has been determined". The city contends that the court was without power to enjoin its tax enforcement proceedings and that if the court had the power to do so, it abused its discretion.

■ It is fundamental law that a taxpayer alleging an unlawful assessment must pay his taxes while the issue is litigated. Commencement of a review proceeding does not stay collection of the tax or enforcement procedures by the municipality (Real Property Tax Law, § 704, subd 3; see *People ex rel. Manhattan Ry. Co. v Coleman,* 48 Hun 602; *People ex rel. New York El. Ry. Co. v Coleman,* 48 Hun 620). Governments must operate and they must have the revenue to do so while the litigation is pending. Since assessments involve subjective judgments of value, the assessor's judgment is presumed valid until the taxpayer sustains his burden of proving otherwise *(Matter of Manufacturers Hanover Trust Co. v Tax Comm. of City of N. Y.,* 31 AD2d 606, affd 28 NY2d 514; *Matter of General Motors Corp. v Finance Administrator of City of N. Y.,* 70 AD2d 843). The aggrieved taxpayer is made whole, at least in theory, by the refund of the overpayment plus interest if the assessor's judgment proves wrong.

■ But this application involves far more than a taxpayer's contention that the assessors have made an error in valuing his property. Petitioner claims that the city officials are guilty of no less than a willful abuse of the tax laws which renders relief pursuant to article 7 of the Real Property Tax Law

meaningless and that it is entitled, therefore, to a preliminary injunction to prevent the threatened loss of its property[3] (CPLR art 63). It hardly seems necessary to analyze the proof before stating that the moving papers establish a strong likelihood of petitioner's ultimate success and irreparable injury to it if the preliminary injunction is not sustained. Its property is presently assessed at $1,135,700, an amount which trial courts in 1972 and in 1977 and this court have found excessive and which this court finds to be grossly discriminatory. Petitioner's prospects in the pending proceedings of reducing the $1,135,700 assessment for the tax years 1977-1979 are, to say the least, good. Furthermore, petitioner alleges that the property has been vacant since 1976, that it is unable to pay the taxes and that it is unable to rent or sell it because of the excessive assessment. It alleges that without the injunction it will lose title by the city's enforcement proceedings.

The record contains abundant evidence to support petitioner's contention that overassessments have been destructive of the value of its property and of the value of downtown Syracuse properties generally. Several established businesses have closed or moved to shopping centers leaving downtown vacancies, many of them for longer periods of time than the extended vacancies of the Guth and Grant properties. As a result, many properties are available and it has been necessary to reduce rents substantially just to interest potential tenants. Conversely, while the retail business climate and property values have deteriorated, assessments have remained uniformly high.[4] The assessment on petitioner's property, $1,135,700, indicates that the assessor has determined that the full value of this property in 1976 was $2,839,250, and this

---

3. Petitioner alleges two other grounds for injunctive relief but neither issue is properly before us on this appeal. It alleges that the Syracuse Tax Act makes the sale of property for delinquent taxes permissive, that the city, as a matter of policy, does not routinely sell tax properties but that it intends to sell petitioner's and that its action in doing so is discriminatory. It also contends that the taking of a tax deed under these circumstances constitutes inverse condemnation.

4. The prime downtown shopping area of Syracuse consists of the 200-400 blocks of South Salina Street. The record contains evidence of actual sales of 16 properties located in those blocks between 1960 and 1979. In 15 cases the *assessment* was more than the *sale price*. In one unusual case, the assessment was more than 18 times the sale price and in another almost 10 times the sale price. The equalization rates during this period were between 34% and 60% of full value. Thus the city, for tax purposes, had established full value at least two or three times greater than actual values insofar as actual values were reflected by current sale prices.

notwithstanding the fact that the University of Rochester transferred it to petitioner that year for a consideration of $175,774.32. The taxpayers have tried to overcome these unlawful assessments in the past by statutory review procedures. The results, from a practical point of view, have been disappointing.

In 1972 Grant recovered a judgment ordering the city to refund $276,400 back taxes plus interest resulting from overassessments for the years 1964-1970. The city did not pay that judgment. It filed a notice of appeal, thus obtaining a statutory stay (CPLR 5519, subd [a], par 1) and in the meantime it continued the old assessment on the property for the years after 1970. Three years after the judgment, in March, 1975, while the taxpayer's motion to dismiss the city's appeal for failure to perfect it was pending, the city stipulated to a reduced settlement of $240,000 to be paid at the rate of $80,000 per year over a three-year period, but only if the store remained open in 1975, 1976 and 1977. It is not clear from the record whether Grant ever received these payments. Presumably, it recovered only $80,000 on its $276,000 judgment because it vacated the store in January, 1976. The remaining provisions of the agreement are also of some interest. In the agreement, the parties stipulated that the pending review proceedings for the years 1971-1976 would be continued. The city agreed to refund overpayments for those years, however, only if the court subsequently determined that the taxpayer had overpaid its taxes by more than $120,000 and then only in the amount by which the court determined that the overpayment multiplied by two exceeded $240,000. The city could refund the amount due the taxpayer after using this formula or it could credit it against petitioner's future tax liability. Conversely, the taxpayer agreed that if it did not succeed in obtaining a judgment mandating tax refunds totaling at least $120,000 for the years 1971-1976 it would pay an additional sum to the city—in effect it would pay more taxes than it was required to pay.

■ Parties to litigation are always free to settle their dispute and end the litigation, of course, and these parties were free to do so. Undoubtedly they recognized that the taxpayer could not lose the pending proceedings and that the latter provision of the agreement would not become operative. But this extraordinary agreement indicates the type of settle-

ment which appears reasonable in Syracuse's tax climate to a taxpayer badly in need of funds.

The taxpayer has not received a refund for overpayments of 1971-1976 taxes either, although the trial court ruled in its favor in 1977. That determination is before us now, but only after we ordered the city to perfect its appeal promptly or we would dismiss it. Doubtless, an application to the Court of Appeals with a statutory stay will follow our disposition here.

Petitioner also has pending review proceedings for the 1977, 1978 and 1979 tax assessments. Those proceedings are not ready for trial because the city's appraiser has yet to complete his preparation.

It is alleged in the moving papers without contradiction that the city has pending some 150 reduction proceedings, most of them involving downtown Syracuse properties and most of them repetitious, and that the delay in disposing of those cases is not delay which may be charged to the petitioners or the court, but is delay attributable solely to the city's insistence that the same appraiser and the same attorney must represent it in all its assessment cases.[5] The Trial Justice took the unusual course of stating in his decision that during his assignment to assessment cases the city had changed counsel and appraisers and it had delayed in finding replacements. These proceedings were delayed unreasonably, he said, not only because of those personnel changes, but also because city officials did not co-operate with the court and "would not proceed diligently in acting upon recommendations of the City's own counsel."

To sum it all up, for the 12 years from 1964 through 1976 the taxpayers have been paying excessive taxes on the Grant property despite the courts' rulings that the assessment for each and every year was unlawful by reason of overvaluation. In 1972 the court ordered a refund of $276,400 for the years 1964-1970. In 1977 the court ordered another refund, $239,695.68, for the years 1971-1976 and our modification will increase that half again. But despite the taxpayers' complete success in the courts and after 15 years of litigation, the city has refunded, at most, $80,000 of the more than $600,000 of taxes which it has unlawfully collected on this property.

5. We know of no reason why the court should not exercise its inherent powers to control its calendars and enter default judgments against the city if it continues to insist on following this practice and unreasonably fails to proceed to trial on pending proceedings.

The city apparently views all of this as the delay and strategy which frequently accompany litigation, unfortunate but not unusual. We do not accept that view. A sovereign may not arbitrarily separate a citizen from his property and then unduly delay its mandated return. Indeed, the Legislature has recognized the need for expeditious review by providing that tax proceedings are to receive trial calendar preference over all other civil actions (Real Property Tax Law, § 700, subd 3) and we previously recognized the hardship involved to these property owners when in the exercise of the administrative duties the court formerly possessed, we designated a Supreme Court Justice to hear all tax review proceedings in Syracuse. Furthermore, the delay was one factor that we considered when we tried to shorten inequality trials by permitting the use of the State Board of Equalization's rate to establish ratio *(Guth Realty v Gingold,* 41 AD2d 479, *supra)* and when we held that the city was collaterally estopped from relitigating the assessment ratios decided in *Guth (McCrory Corp. v Gingold,* 52 AD2d 23, *supra).*

It is not difficult to sort out the considerations at work here. The city's constitutional debt limit and the amount of important financial aid it receives are computed by the total assessed value of the real property in the city. An important segment of any municipal assessment roll is the commercial properties of its downtown shopping area. These properties not only contribute high values to the assessment roll, but downtown property owners represent a relatively innocuous part of the city constituency. Thus, there is much to win and little to risk by keeping downtown assessments high. True enough, the courts have held many of these assessments to be unlawful and eventually the city will have to refund the taxes overpaid. But in the meantime, the city has had the use of the taxpayer's money and it has cost the city only 3% interest (see General Municipal Law, § 3-a). Had the city been required to borrow the same funds, it would have had to pay 5-8%, depending upon long or short-term rates. In effect, the city has used the tax laws to "borrow" money from the taxpayer against the taxpayer's wishes and at 3% interest, and it has the use of the money until the court orders it repaid, a date which is subject to the delays of litigation.

The taxpayer, however, cannot obtain money at 3% for its needs. Unable to offer the creditor the credit rating of a municipality or the income tax advantages of interest paid by

a municipality, it cannot borrow money even at the 5-8% rate. At best, in today's money market, the taxpayer's money is worth 10% whether it has to borrow to pay its taxes or uses available funds. If it later wins its assessment case, the taxpayer gets the overpayment back with 3% interest and with that it must pay the expenses of the litigation. This may be a tolerable arrangement when a good-faith error of overvaluation occurs in an annual assessment, but when overvaluation is repeated year after year, it represents precisely the abuse which the Legislature sought to correct when it enacted subdivision 2 of section 722 of the Real Property Tax Law. When viewed in the context of this case the $2,500 additional allowance permitted by that statute seems a trivial consolation.

*Ad valorem* tax laws are predicated on the assumption that property values will be fairly determined, but the city has ignored the statutory mandate to assess real property at its fair market value and it has repeatedly imposed unlawful assessments on petitioner's property. The taxpayer's demonstrably meritorious complaints have been delayed by tactical maneuvers designed to accomplish only one purpose—to hold the line on assessment values at whatever cost to the property owner. Justice ARONSON not only had the power to enjoin such conduct, he acted well within his discretion in doing so.

We do not suggest that injunctive relief is available in ordinary tax review proceedings or even in unusual ones. We do hold, however, that this taxpayer has demonstrated a long and aggravated pattern of conduct by the city from which the taxpayer cannot reasonably protect itself or its property without injunctive relief. This order imposes little hardship on the city. It may hire additional counsel and appraisers, if necessary, but surely, with the extensive evidence of value in these several proceedings and the number of court determinations to guide it, the city can reach a reasonable adjustment of petitioners' pending review proceedings. Having failed to do so, or to litigate the proceedings expeditiously, the only visible relief to this taxpayer is injunctive relief.

The judgments and the orders granting costs and allowances should be modified in accordance with this opinion and, as modified, affirmed. The order enjoining appellants Srogi and the City of Syracuse is affirmed.

DILLON, P. J., CARDAMONE, DOERR and WITMER, JJ., concur.

Appeal No. 1. Order and judgment unanimously modified and, as modified, affirmed, with costs to petitioner, in accordance with opinion by SIMONS, J.

Appeal No. 2. Order and judgment unanimously modified and, as modified, affirmed, with costs to petitioners.

Appeal No. 3. Order unanimously affirmed, with costs.