**FRIARTON ESTATES CORP., Bwit Fifty-Fifth Street, Inc., and Mid-Central Properties, Ltd., Plaintiffs-Appellees,**

v.

**The CITY OF NEW YORK, Philip R. Michael, as Commissioner of Finance of the City of New York, and Tax Commission of the City of New York, Defendants-Appellants.**

**No. 873, Docket 81–7781.**

United States Court of Appeals, Second Circuit.

Argued April 6, 1982.

Decided June 7, 1982.

Richard A. Givens, New York City (Botein, Hays, Sklar & Herzberg, Gina Schachter, Roger F. Bloom and Margaret Serena Oppel, New York City, of counsel), for plaintiffs-appellees.

Morris Einhorn, New York City (Frederick A. O. Schwarz, Jr., Corp. Counsel of the City of New York, Leonard Koerner, Asst. Corp. Counsel, New York City, of counsel), for defendants-appellants.

Before FRIENDLY and NEWMAN, Circuit Judges, and CURTIN, District Judge.*

FRIENDLY, Circuit Judge:

The City of New York, its Commissioner of Finance, and the Tax Commission of the City of New York (sometimes hereafter referred to collectively as "the City") appeal pursuant to 28 U.S.C. § 1292(a)(1) from an order in this action under 42 U.S.C. § 1983 granting a preliminary injunction against the City's taking title to properties pursuant to a New York state court judgment based on plaintiffs' failure to pay sewer rents, water charges and real estate taxes for the tax years 1973/74 through 1976/77. We reverse, with instructions to dismiss the complaint, primarily on the ground that plaintiffs' claims of violation of their constitutional rights are barred by reason of prior state court litigation of the claims here advanced.

I.

Plaintiff Friarton Estates Corporation (Friarton) is the owner of properties known as Block 735, Lot 30, and Block 1042, Lots 2, 3, 4, 5, 6, 7, and 64 on the tax map of the City of New York (the properties). Friarton acquired Block 735, Lot 30, from plaintiff BWIT Fifty-Fifth Street, Inc. (BWIT) in June 1977 for $10,000 at a time when the property was subject to over $200,000 in outstanding claims by the City for sewer rents, water charges and real estate taxes. Friarton acquired the lots in Block 1042 from plaintiff Mid-Central Properties, Ltd. (Mid-Central) in June 1977 for approximately the same sum; these properties were then subject to over $150,000 in similar claims by the City. The properties, along with many others, were included in two foreclosure proceedings brought by the City, *In Rem Action Nos. 29 and 30*, commenced on July 6, 1977 and August 28, 1978, respectively, in the Supreme Court of New York for New York County. The history of this litigation will be recounted in Part II below. It suffices here to say that on May 6, 1981, the Supreme Court for New York County entered a judgment reinstating an earlier judgment entered May 20, 1980, which permitted the City to take title to the properties.

Plaintiffs then commenced this action in the District Court for the Southern District of New York, seeking an injunction against enforcement of the state court foreclosure judgments until state court proceedings challenging the tax assessments had been determined, and damages "to redress violations of rights secured to plaintiffs by the Constitution of the United States and 42 U.S.C. § 1983" (Complaint ¶ 1); federal jurisdiction was claimed under 28 U.S.C. §§ 1331 and 1343(3). Plaintiffs' basic contention was that the City would be denying them due process of law and taking their property without just compensation in violation of the Fourteenth Amendment by taking the properties for nonpayment of taxes while denying them a speedy determination of certiorari proceedings which they had brought to challenge the assessments of the properties. The district court reviewed

* Chief Judge District Court for the Western District of New York, sitting by designation.

the state court record in the proceedings mentioned above and in certain related proceedings and held three hearings at which no testimony was taken.

After reference to and report by a magistrate, the district court, on October 2, 1981, rendered an elaborate opinion in which it rejected the City's contentions with respect to the preclusive effect of the previous proceedings, the Tax Injunction Act, 28 U.S.C. § 1341,[1] and the merits, and concluded that plaintiffs had satisfied the first branch of what it characterized as "the rule of this Circuit as expressed in *Sonesta International Hotels Corp. v. Wellington Associates,*" 483 F.2d 247, 250 (2 Cir. 1973), with respect to entitlement to a preliminary injunction.[2] However, the court thought it would be inappropriate to undertake the trial of plaintiffs' tax claims. Accordingly it entered an order preliminarily enjoining defendants from taking title to or possession of the properties or from causing a deed or deeds of such properties to be executed, delivered or recorded. This injunction might be dissolved on notice of the occurrence of events described in the margin.[3] Plaintiffs were to deposit all rents and operating income with a receiver, who was to pay all reasonable and necessary operating costs including current sewer and water charges, but not mortgage payments or current property taxes. As will be seen, the effect of the injunction was to deny the City the benefit of the judgment in the state court foreclosure actions, won after many years of effort against the very contentions made here, and to deprive it of payments admittedly due for sewage, water and taxes until the conclusion of the certiorari proceedings.

## II.

Before going further it will be well to describe the New York procedures for review of real estate tax assessments.

New York City Charter § 163 provides that during the six week period February 1 through March 15:

> the books of annual record of the assessed valuation of real estate are open for public inspection, any person or corporation claiming to be aggrieved by the assessed valuation of real estate may apply for correction of such assessment,

specifying the grounds of any claimed illegality, and the extent of any claimed overvaluation or inequality. Section 164 provides that any such applicant may have a hearing before the Tax Commission, which is empowered to

> compel the attendance of witnesses, administer oaths or affirmations and examine applicants and other witnesses under

---

1. This provides:

    The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

2. Although the point is not of importance in this case, we take occasion to remind district judges that the statement in *Sonesta International Hotels* is not this circuit's last word on entitlement to a preliminary injunction. We have further refined the statement in that opinion to read that preliminary

    injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

    *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2 Cir. 1979) (per curiam); see

*Caulfield v. Board of Education,* 583 F.2d 605, 610 (2 Cir. 1978); *State of New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 750 (2 Cir. 1977) (stressing the requirement of irreparable injury on the second branch); and Judge Mulligan's article, *Preliminary Injunction in the Second Circuit,* 43 Brooklyn L.Rev. 831 (1977).

3. (i) Plaintiffs neglect or fail to go to trial on their tax certiorari cases when and if permitted to do so; or

    (ii) Plaintiffs fail to pay within sixty (60) days after entry of a state court judgment, taxes and penalties as found due following the adjudication of the tax certiorari cases, with respect to any fiscal year comprised within the pleadings in *In Rem Foreclosure No. 29;* or

    (iii) Any other change in fact or law occurs after the date hereof and renders continued injunctive relief inequitable or unnecessary.

oath. It shall make rules of practice for proceedings before the tax commission, and such rules and regulations as may be appropriate and expedient to the end that the taxpayers may have a hearing in the borough in which they reside or in which their property is located.

Under §§ 165, 166, the Tax Commission is required to render its determination by the 25th of May, and a further proceeding "to review and correct on the merits any final determination of the tax commission" may be brought by October 25th of that year. Plaintiffs had the benefit of this procedure but they assert that review by the Tax Commissioner is generally unproductive and the City does not seriously dispute this.

New York City Administrative Code § 166–1.0(b) provides that the judicial review mentioned above shall be by a Special Term of the Supreme Court in the appropriate county and shall be based "on one or more of the following grounds, which must be specified in such petition:"

1. That the assessment is illegal, and stating the particulars of the alleged illegality, or

2. That the assessment is erroneous by reason of overvaluation, or

3. That the assessment is erroneous by reason of inequality, in that it has been made at a higher proportionate valuation than the assessment of other real property of like character in the same ward or section, or other real property on the assessment rolls of the city for the same year, specifying the instances in which such inequality exists and the extent thereof, and stating that the petitioner is or will be injured thereby.

Plaintiffs had pending petitions for such review, commonly called petitions for certiorari, raising the second and third objections, for each tax year from 1972/73 to 1977/78.

While the record is replete with charges concerning responsibility for the delays in bringing these cards to trial, which we do not find it necessary to determine, it is at least clear that plaintiffs were far from diligent in seeking early trials. Although

the Rules of the Appellate Division for the First Department § 660.18(c) require that there be a pretrial hearing for purposes of settlement and that, to render this productive, the taxpayer must file an "eight month notice" to the Corporation Counsel accompanied by a verified or certified statement of income and expense, plaintiff Mid-Central in its certiorari proceedings for the tax years 1973/74 through 1976/77 did not file such a statement until July 13, 1978, a year after the City had begun its foreclosure action; even then statements of income and expenses were included only for the tax year 1975/76, the excuse being that this was the only full year in which Mid-Central operated the property. Notes of issue for the tax year 1974/75 were not filed for lots 2, 3, 4, 5, 6, 7 and 64 of Block 1942 until June 26, 1979, and with respect to lot 30 of Block 735 until July 3, 1979.

It is also desirable to note at this point that review of assessments on real property in New York State has been in considerable turmoil since the decision of a divided Court of Appeals in *Hellerstein v. Assessor of the Town of Islip*, 37 N.Y.2d 1, 371 N.Y.S.2d 388, 332 N.E.2d 279 (1975), which invalidated as a matter of state statutory law a practice of nearly 200 years standing whereby assessments were made on the basis of a percentage rather than the whole of full value. Recognizing the revolutionary character of the decision, the court limited it to future assessments and gave the Township until December 31, 1976, to comply. The state legislature subsequently enacted various legislation suspending the requirement of full valuation to permit time for reassessments.

The problem which New York courts had in adjusting to *Hellerstein* was aggravated by legislation prohibiting use in challenges alleging inequality of tax assessments of the State Board of Equalization and Assessment (SBEA) ratios of assessed value to full value for each assessing unit. See *Slewett & Farber v. Board of Assessors*, 54 N.Y.2d 547, 554, 446 N.Y.S.2d 241, 430 N.E.2d 1294 (1982). In *Colt Industries, Inc. v. Tax Comm'n*, 183 N.Y.L.J. (No. 108) June 4,

1980, p. 10, col. 2, the Special Term of the Supreme Court for New York County was obliged to consider, *inter alia*, a taxpayer's challenge to the constitutionality of this evidentiary limitation. Justice Mangan held that pursuant to New York City Administrative Code § 166–1.0(b), a New York City taxpayer seeking to prove unequal treatment was required to establish inequality as compared with property of like character in the same ward or section and, if no such samples were available, elsewhere in the City.[4] The court held that in light of the recently-amended statute, RPTL § 720(3), which precluded use of the SBEA ratio in a certiorari proceeding, that rate was irrelevant to the standard of proof required in the City and that in any event the legislature had power to alter rules of evidence in certiorari proceedings. Colt Industries was directed to make its demand upon the City for admission of ratio evidence and the parties were ordered to file a statement of the appraised values of their selected parcels by August 17, 1980, for trial on the issue of inequality, which the court later scheduled to commence on October 14, 1980. Trial of a certiorari brought by Equitable Life Assurance Co. (Equitable) was scheduled for October 15, and trials for other taxpayers were scheduled for later dates.

Equitable moved for an order declaring the SBEA's ratio admissible in proof of inequality despite the *Colt* decision or, in the alternative, that its trial be stayed pending appeal from the expected denial of the substantive portion of the motion. Both parts of the motion were denied, Equitable appealed, and on October 7, 1980, the Appellate Division granted a stay pending determination of the appeal on the merits. Shortly thereafter the Appellate Division granted a similar motion for a stay by Colt Industries. It required both cases to be argued at its next term and later made clear, at the City's request, that the stay was of both ratio and valuation issues.

Before the latter clarification Justice Mangan had set trial dates on the issue of overvaluation for 14 petitions also claiming inequality, the first petitioner on the schedule being Freewalt Realty Corp. (Freewalt). The City moved to stay these trials, pointing out that while it had opposed any stay in the *Colt* and *Equitable* cases, a stay on ratio had been granted by the Appellate Division, "disposition of the pending appeals may well obviate the need to litigate the issue of value" because the prospects for settlement are enhanced once the applicable ratio is determined, and "the Court's approach to value in the ratio portion may be critical on the valuation phase of the case." This position was strengthened when the Appellate Division amended its stay in *Colt* to include both ratio and valuation issues. Accordingly, on December 5, 1980, the Special Term entered an order staying its entire calendar in which inequality was claimed pending final appellate decision of *Colt* or further order of the Appellate Division.

On May 14, 1981, the Appellate Division 81 A.D.2d 777, 439 N.Y.S.2d 24 affirmed the Special Term's decision in *Colt*. Appeal was taken to the Court of Appeals, which affirmed on January 7, 1982, 54 N.Y.2d 533, 446 N.Y.S.2d 237, 430 N.E.2d 1290.

Since that time certiorari proceedings for the properties have been promptly scheduled. Valuation trials are set for May and June 1982, and the Supreme Court has indicated that the trial date for determining ratio will be announced during the summer of 1982.

### III.

With this background we now undertake a more detailed analysis of the proceedings in the City's *in rem* action which it claims to have operated as *res judicata* on the contentions that plaintiffs have advanced here.

In September 1977, Friarton filed identical answers (one on each block). The answers alleged in conclusory form that all

---

**4.** Friarton makes much of Justice Mangan's remark that "inequality actions within the City have been as rare as a robin in January." The rarity was not due to unwillingness of the New York courts to hear such cases but to difficulties of proof, not shown to be unconstitutional.

lawful taxes, assessments and other charges levied against the properties more than one year in arrears had been duly paid and contained two counterclaims. One attacked the constitutionality of the New York rent control laws and sought damages of $1,000,-000. The other pointed to pending certiorari proceedings for the tax years 1972/73, 1973/74, 1974/75, 1975/76, 1976/77, and 1977/78 and suggested that the real estate taxes allegedly due the City would be substantially reduced.

In July 1978 the City moved to strike the answers. The motion contended, *inter alia*, that under Code § D17–9.0, remedies for alleged abuses of rent control may not be sought in an *in rem* tax foreclosure proceeding; that under Code § D17–9.0(e), Friarton was allowed six months after submission of its answer to effect a sale and retain any surplus above arrearages but had not done this and that no note of issue had been filed with respect to the certioraris referred to in Friarton's answers. Friarton countered in October 1978 that triable issues of fact existed with respect to the unconstitutionality of rent control and that it was preparing to file a note of issue with respect to all pending certiorari proceedings. Beyond this Friarton cross-moved for leave to file amended answers and to consolidate the certioraris with the *in rem* action.

The amended answers contained a number of affirmative defenses. Among these were that the tax certiorari proceedings would come to trial approximately in January 1980; that the reason for the delay was the backlog of such cases and the lack of personnel in the City Corporation Counsel's Real Estate Tax Division; that the outcome of the certioraris "would enable the Respondent to either pay the taxes in full or enter into an In Rem Agreement with the City"; and that it was "inequitable for the City to tax the respondent at an artificially high

rate, to then foreclose for respondent's failure to pay same and at the same time deny respondent its day in Court." Friarton also realleged its counterclaim for $1,000,000 damages by reason of the rent control laws. The City countered that further delay in these certiorari proceedings could not justify further delay in tax collection, particularly in light of Code § D17–25.0, which permitted Friarton to retain the properties by paying 25% of the arrearages, with an additional three years to pay the balance, during which Friarton could presumably bring its certiorari proceedings to trial.

Late in 1978 and early in 1979 Friarton made a number of further motions unnecessary to describe in detail. Opposing these, the City argued that Friarton had been offered and had rejected the opportunity under Local Law No. 34 to pay 15% of the arrearages and the balance over an extended period of up to 8 years and that the Corporation Counsel had also proposed that Friarton could eliminate the properties from the delinquent list if it would pay the water charges and sewer rents as well as the amount of taxes that would be due on the valuation which it had alleged in its own certiorari proceedings [5]—a proposal which Friarton declined.

After Friarton had filed further lengthy papers developing, with colorful rhetoric, its theses that the properties were grossly overvalued because of the depressing effect of rent control, that the City had refused to hold settlement conferences or permit trial of the certioraris, that under these circumstances it would be a denial of due process to permit the City to foreclose, and that the pending certiorari proceedings should be consolidated with the *in rem* foreclosure action, Justice Martin Evans at Special Term handed down a decision on August 31, 1979, granting the City's motion for summary judgment. He allowed the amend-

---

**5.** The offer was conditioned on Friarton's agreeing that if in the certiorari proceedings the court should fix values above those claimed by Friarton, the latter would pay taxes on such values within 60 days and consent to the City's entering summary judgment ex parte upon its failure to do so. We read this as meaning that

the 60 days would not begin to run until the appellate process was exhausted. If Friarton had any doubts on this score, discussion could have resolved them. Friarton's counsel admitted at oral argument that no attempts at clarification were pursued.

ment of the answer except for portions, not heretofore mentioned, asserting affirmative defenses that attacked the reduction of the period of time after which a foreclosure action may be brought for tax delinquencies from 3 years to 1 year and the assertion of the counterclaim based on the unconstitutionality of the rent control law, which was to be severed and continued. He specifically allowed an amendment which alleged the inequity of permitting foreclosure for failure to pay taxes while the amount due was being challenged in the certioraris which had not yet been brought to trial. He entertained, but denied, Friarton's motion to consolidate the pending tax certiorari cases with the foreclosure action. He agreed with Friarton that

It would, of course, be inequitable to allow In Rem foreclosure under Title D of the Administrative Code, which could result in a transfer of title to the City, if in fact the taxes were improperly overassessed and if defendant did not have a reasonable opportunity to obtain a proper assessment. Such a transfer of title would be an unconstitutional taking of property without compensation.

However, he found that

Although the pleadings of the defendant allege that all taxes lawfully due have been paid, it is clear from the affidavits submitted on the motion that not only is there a default in the payment of the amount of taxes assessed; there has been a default in the payments of the amount of taxes admitted by defendants to have been properly due.

In October 1979 Friarton moved for reargument. This stated that

IT IS RESPONDENT'S MAIN CONTENTION, NOT DENIED BY THE CITY OR THE COURT, THAT THE CONFISCATORY TAXES HEREIN LEVIED BY THE CITY ARE UNCONSTITUTIONAL AND UNLAWFUL, AND THE CITY MAY NOT LAWFULLY COLLECT THEM BY THIS FORECLOSURE PROCEEDING, UNTIL RESPONDENTS HAVE THEIR DAY IN COURT TO SO PROVE. (Capitalization in original.)

Friarton contended that the court had been inconsistent in granting summary judgment to the City despite its acknowledgment that overassessment would constitute a defense. It stated that notes of issue had in fact been filed in the certioraris and that "the City has repeatedly delayed [certiorari] trials through its myriads and labyrinths of rules and failure to assign attorneys to try cases". It again sought consolidation of the certioraris with the *in rem* action as the only equitable course. A subsequent affidavit placed before the court a portion of an affidavit, apparently prepared for some other proceeding, entitled "History of Rent Control in the City of New York."

The City submitted an affirmation in opposition to the motion for reargument. This stressed that the court had said only that it would be inequitable to allow foreclosure if the taxes had not been lawfully assessed but that the court had found that they were. It called attention to the City's offer to drop the foreclosure action if defendants would pay the water charges and sewer rents and the amounts they contended to be due as taxes. It pointed out that the notes of issue had been filed only after all papers had been submitted and the matter had been argued.

On January 3, 1980, Justice Evans entered an order denying Friarton's motion to reargue. He considered that "Movant has failed to meet its burden of proving that the Court misunderstood, misconstrued, overlooked or incorrectly decided any question of law or fact." The court remarked that Friarton was endeavoring to have the court pass on public policy questions which were ultimately for the legislature to decide and that insofar as defendants raised procedural due process questions, "such have already been mooted by movant's failure to pay even the taxes which would have been due had the valuation been what movant has claimed." Supplemental judgments directing that the City take title to the properties were entered on May 20, 1980, with a 10 day stay of enforcement to permit appeal.

Friarton appealed to the Appellate Division, First Department. It reiterated the arguments it had made at Special Term—that rent control had so depressed the value of the properties as to render the assessments outrageously excessive, and that for the City to take the properties before Friarton had had an opportunity to demonstrate this in the pending certioraris violated due process. The statute permitting a 15% down payment of delinquencies with the balance payable over 8 years and the City's offer to accept payment on Friarton's own assessment were an inadequate answer because "if the assessed values were upheld or insufficiently reduced", those payments would be lost. Indeed, the City's offer was characterized as "an affront to our judicial system." The Appellate Division unanimously affirmed without opinion, 79 A.D.2d 899, 435 N.Y.S.2d 871 (1980).

Friarton then appealed to the Court of Appeals on constitutional grounds pursuant to CPLR 5601(b)(1). The constitutional claims were stated to include:

Whether summary judgment of *in rem* tax foreclosure pursuant to Title D of the Administrative Code of the City of New York is an impermissible deprivation of property without due process of law under the Fifth and Fourteenth Amendments to the United States Constitution and under Article 1, § 6 of the New York State Constitution, when the property owners have been denied a prior or contemporaneous hearing in any court on the validity and constitutionality of the assessed valuations on which the allegedly due taxes are based, and denied consolidation of their tax certiorari cases with the *in rem* foreclosure suit?

Friarton also claimed that it had been deprived of its property

without due process of law under the Federal and State Constitutions, by subjecting [it] to *in rem* foreclosure by the City without the opportunity to make constitutional, inequality and other legal challenges

to assessments at "large multiples" of market value on property "rendered economi-

cally and functionally worthless by the City's multi-dimensional 'regulatory' controls", and that

foreclosure for water and sewer taxes alone is likewise unconstitutional when the effect is to deprive owners of property without the opportunity of a prior or contemporaneous hearing on the validity of the primary tax in dispute.

The City also indicates that, in Friarton's brief to the New York Court of Appeals,

Friarton rejected the rule that taxes must be paid first and their alleged excessiveness litigated later, stating—"the rule does not apply when city officials make 'willful abuse of the tax laws' rendering review proceedings 'meaningless' " citing *Grant v. Srogi*, 71 A.D.2d 457, 470–1, 423 N.Y.S.2d 324 (4th Dept., 1979), where tax collection was enjoined for such abuse of the tax laws; and that "the City had systematically circumvented in the most blatant manner any possibility that appellants' pending tax certiorari proceedings will be reached for trial within any reasonable period.

The Court of Appeals dismissed Friarton's appeal on March 26, 1981, "upon the ground that no substantial constitutional question is directly involved", *Friarton Estates Corp. v. City of N. Y.*, 53 N.Y.2d 795, 439 N.Y.S.2d 1031, 422 N.E.2d 597 (1981).

However, this was not to be the end of the proceedings in the state courts. When the City moved at Special Term to reinstate the supplemental judgments of foreclosure, Friarton cross-moved, under CPLR § 5015(a)(2), (a)(3), for an order staying enforcement of the judgments and "directing immediate trials for dates certain ... in the above-mentioned tax certiorari proceedings." The newly discovered evidence offered pursuant to § 5015(a)(2) was the *Freewalt* stay, which had been entered just prior to the decision of the Appellate Division, and an article about New York City Tax Assessments published in the New York Times of April 24, 1981. The themes were familiar—an alleged five to eight years of purposeful and wrongful delays in processing the certioraris as contrasted with the two years allegedly set as a maximum

in *Rosewell v. La Salle National Bank*, 450 U.S. 503, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981), and the power of a New York court, now made explicit by *W. T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 515–18, 438 N.Y.S.2d 754, 420 N.E.2d 946 (1981), decided by the Court of Appeals only a few weeks after its dismissal of Friarton's appeal, to enjoin a city from collecting real estate taxes pending the decision of certiorari proceedings "[w]here there has been a deliberate misuse of the taxing power". *Id.* at 517, 438 N.Y. S.2d 754, 420 N.E.2d 946. On May 6, 1981, Special Term denied Friarton's cross-motion and permitted the City to take title.

Less than a fortnight later, on May 19, 1981, Friarton began this action. Also, on June 22, 1981, it petitioned the Supreme Court of the United States for certiorari to review the judgment of the Court of Appeals. The grounds for the petition were the usual ones: The assessments were based on valuations that were grossly excessive because of their failure to take into account operating losses caused by the combination of New York City rent controls and service requirements, and "By a variety of procedural delays, the City of New York had blocked trial of tax certiorari proceedings". Reference was made to the *Freewalt* stay. The Supreme Court. denied certiorari on 454 U.S. 837, 102 S.Ct. 141, 70 L.Ed.2d 117 (1981).

### IV.

■ We have set out the history of the state court litigation at this length because,

save perhaps for the argument as to the *Freewalt* stay, which we will consider separately below, mere statement is all that is required to support the City's argument of *res judicata*, which the district court rejected. All the constitutional contentions which the district judge found so persuasive in plaintiffs' favor—the long delays in the proceeding of certioraris, the inequity of foreclosure for failure to pay possibly erroneous taxes without an opportunity for timely challenge, the allegedly unsatisfactory character of the remedies of partial payment which plaintiffs had by virtue of statute and of the City's ad hoc offer[6] —were advanced not once but time and again at each of the three levels of the New York court system and on petition for certiorari to the United States Supreme Court. It is of no consequence whether the district court or this court agrees or disagrees with the determinations of the New York courts on issues fully raised before and necessarily decided by them. *Res judicata* protects wrong decisions as fully as right ones. It is immaterial that the questions were constitutional in character, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923), or that they are now asserted in an action under 42 U.S.C. § 1983, *Allen v. McCurry*, 449 U.S. 90, 96–105, 101 S.Ct. 411, 416, 420, 66 L.Ed.2d 308 (1980); *Ellentuck v. Klein*, 570 F.2d 414, 425 (2 Cir. 1978). We need not here debate whether in such an action 28 U.S.C. § 1738[7] applies in its full vigor or is subject to some limita-

---

**6.** In this court plaintiffs object to the "self-assessment" remedy not so much on the ground asserted in the state court, namely, that until the certioraris were decided, making such payment might be sending good money after bad—a position plainly at war with the general principle of "pay first, litigate later" relating to claims of excessive taxation, see, e.g., *State Railroad Tax Cases*, 92 U.S. 575, 613–14, 23 L.Ed. 663 (1876); *Phillips v. Commissioner*, 283 U.S. 589, 595–96, 51 S.Ct. 608, 611, 75 L.Ed. 1288 (1931)—as on the basis that knowledge of the ultimate tax liability was essential to permit plaintiffs to secure financing. This is not a new issue but simply another argument with respect to the adequacy of the solutions proffered by the City, which could perfectly well

have been made in the state courts and is barred by the doctrine of *res judicata*.

**7.** This provides:
> The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
> The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.

tions, see Judge Waterman's discussion in *Winters v. Lavine,* 574 F.2d 46, 54–60 (2 Cir. 1978). On any view a taxpayer may not engage in extensive proceedings throughout the state court system, and then, after every point has been decided against him by the state courts and the Supreme Court has denied certiorari, make a fresh start in federal court. These considerations are of particular pertinence where a federal court plaintiff seeks further delay in the collection of city taxes of which, in state court proceedings, he has thwarted collection, even of water and sewage charges, for eight years. See *Dows v. City of Chicago,* 11 Wall. (78 U.S.) 108, 110, 20 L.Ed. 65 (1870), quoted with approval in *Fair Assessment in Real Estate Association v. McNary,* 454 U.S. 100, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981).

The district judge, of course, was as well aware of these principles as we are. He thought them inapplicable. To the correctness of that determination we now turn.

The first ground advanced was that "Since plaintiffs' counterclaims were severed and continued as a separate action which has never reached trial or a determination on the merits, the state court judgment was not responsive to these issues, and *Rooker* does not bar this court from addressing those issues." 525 F.Supp. at 1258. What this neglects is that the severed counterclaims were simply the present plaintiffs' claims for damages arising from the effect of rent control, not their affirmative defenses to the foreclosure which the judge at Special Term allowed them to plead. Plaintiffs fully recognized this, to the tune of scores of pages of affidavits and briefs at Special Term, in the Appellate Division, in the Court of Appeals, and in the Supreme Court of the United States.

The district court went on to say that plaintiffs did not have a full and fair opportunity "in the earlier litigation to address the legal and factual issues claimed to be

decisive in the current action." *Id.* However, as to this also the judge relied on the severance of the counterclaims and ignored the retention of the affirmative defenses. Present plaintiffs did have a full and fair opportunity to present to the state courts their contention that the procedure followed by the City—pushing ahead with the *in rem* proceeding while no action had been taken in the certioraris—violated their Fourteenth Amendment rights. Although the opinion of the Special Term may not constitute an altogether satisfying answer to plaintiffs' claims, the Appellate Division wrote none, and the Court of Appeals simply branded plaintiffs' constitutional claim as insubstantial, the record leaves no room for doubt that the claims of lack of due process and taking of property without just compensation were fully presented to the New York courts, and that those courts, entertained them but denied them on the merits.

■ We have reserved the question of the delay resulting from the *Freewalt* stay for separate consideration. Arguably that too is barred by *res judicata* since it was raised in the cross-motion of April 1981 under CPLR § 5015(a)(2) and Friarton took no appeal from the denial of that motion. Against this it can be urged that § 5015(a) states that a court "may" grant relief from a judgment, and that, in denying the motion, the Special Term might have availed itself of a discretion seemingly thus confided and may not have reached the merits. Under 28 U.S.C. § 1738 the order denying the § 5015(a) motion would have whatever *res judicata* effect would be accorded to it by New York law. The parties have cited no New York authorities on this question and our research has discovered none except a decision at Special Term, *Rae v. Rosenberg,* 67 Misc.2d 881, 882, 324 N.Y. S.2d 898 (1971) (discussing predecessor to § 5015(d)), which is of comfort to the plaintiffs. While a New York court confronted

Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Terri-

tories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

with the problem would doubtless consult decisions with respect to the comparable F.R.Civ.P. 60(b), it would find little guidance, see 18 Wright, Miller & Cooper, Federal Practice and Procedure § 4447 (1981), and cases there cited. Although we incline to the view that, since it raised the *Freewalt* stay issue in the state court and there is no indication that the state court did not decide it on the merits, Friarton should be bound by that court's adverse ruling, we prefer not to rest decision upon that ground but rather to address this portion of Friarton's argument upon the merits.

It is not clear in the first place that the *Freewalt* stay has any relevance. The state courts upheld the judgment that the City was entitled to take the properties on May 20, 1980, despite the lack of progress on the certioraris. The City would have taken possession except for the stays granted in this action pending two levels of appellate review which did not expire until March 26, 1981. Since the City's right to take title vested on May 20, 1980, it is hard to see that a further postponement of trials in the certioraris as a result of the *Freewalt* stay, entered on December 5, 1980, is material.

Beyond that, the *Freewalt* stay was reasonable under the circumstances. The justification for the original stay in *Colt* and the later *Freewalt* stay was that if the certiorari proceedings were tried before *Colt* was decided by the Court of Appeals and that court should then decide in favor of allowing proof of inequality by SBEA ratios, the expense to the parties and the burden on the courts incident to proving inequality by presenting evidence of the values of similar parcels would have been wasted. Friarton in effect acquiesced in this, since it never moved as another taxpayer, 40 Sutton Associates, did with the City's acquiescence, albeit unsuccessfully, for a trial on the basis of values of similar parcels. Moreover, the City plausibly urged that it would be more economical both for the courts and the parties if many of the certiorari proceedings were simultaneous, which would reduce the aggregate litigation burden since ratios for parcels of like character could thus be determined only once, in a joint proceeding. Once it had been decided to stay the inequality calendar for these reasons, it was reasonable to stay the overvaluation proceedings for cases where there was also an inequality challenge because, depending upon the evidentiary rule ultimately adopted, there might be substantial overlap in proof between the two proceedings. The New York courts handled the *Colt Industries* case expeditiously, so that the *Freewalt* stay lasted only 13 months, from December 1980 through the decision by the Court of Appeals in the *Colt Industries* case on January 7, 1982. We do not read the *Rosewell* decision, *supra*, 450 U.S. 503, 101 S.Ct. 1221, 67 L.Ed.2d 464, as setting an outside limit of two years and precluding consideration of special circumstances that may justify further delay. Since expiration of the stay, the City has moved to schedule trials with reasonable speed.

The result is that plaintiffs' claims of denial of Fourteenth Amendment rights by delays prior to May 20, 1980, are barred by *res judicata* and its claim of subsequent delay, even if relevant, is without merit. We therefore reverse the grant of the preliminary injunction preventing the City from executing the judgment of the Special Term permitting it to take title to the properties. In so doing we would hope, although we cannot properly require, that the City will leave open for a reasonable period of say 30 days from the coming down of our mandate the opportunity to plaintiffs to avoid execution by paying the water rents, sewage charges and the taxes resulting from plaintiffs' own valuation and agreeing to pay the balance of taxes found to be due within 60 days of entry of a state court judgment following adjudication of the tax certiorari cases and any appeal of such an adjudication, to which we have previously referred. Now that the string has been played out, plaintiffs may consider the latter opinion more seriously than they did last summer when the City renewed its offer.

■ We believe also that, as urged by the City, this is an appropriate case for invok-

ing the doctrine of *Smith v. Vulcan Iron Works*, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897); *North Carolina Railroad Co. v. Story*, 268 U.S. 288, 292, 45 S.Ct. 531, 532, 69 L.Ed. 959 (1925); and *CES Publishing Corp. v. St. Regis Publications, Inc.*, 531 F.2d 11, 15 (2 Cir. 1975), that when on an appeal from the grant of a preliminary injunction it appears that the "bill had no equity to support it", 165 U.S. at 525, 17 S.Ct. at 410, a court of appeals should direct dismissal of the complaint. The facts critical to a decision here are found in the record of state court actions, there is no indication that anything more could be produced at a trial, and plaintiffs' efforts to postpone the payment of water and sewage charges and of taxes admittedly due have gone on long enough.

The order granting a preliminary injunction is reversed and the cause is remanded with directions to dismiss the complaint.